

FILED

May 04 2016, 6:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Scott Schuck, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | May 4, 2016 <br><br> Court of Appeals Case No. <br> 73A01-1507-CR-981 <br><br> Appeal from the Shelby Superior Court <br><br> The Honorable Richard D. Culver, Special Judge <br><br> Trial Court Cause No. <br> 73D01-1407-MR-1 |

**Baker, Judge.**

[1] Scott Schuck appeals the trial court's denial of his motion to correct error in which he argued that his attorney was entitled to reimbursement from public funds for investigatory costs accrued prior to trial. Finding that these investigatory costs were necessary for an adequate defense, but that the calculation of reasonable costs is a decision better made by the trial court, we reverse and remand.

## Facts

[2] On July 31, 2014, the State charged Schuck with the murder of his former girlfriend, Rebecca Cassidy. Schuck had a previous relationship with the law firm of Baldwin, Adams & Kamish (the Firm), and he told the trial court that since he had retained the Firm, he would not need a public defender.

[3] On October 14, 2014, Schuck and the Firm petitioned for attorney fees and reasonable expenses. The Firm stated its belief that it would be entitled to withdraw from the case under Indiana Rule of Professional Conduct 1.16(b)(6) because Schuck was indigent, would likely be unable to pay, and would therefore impose "an unreasonable financial burden on the lawyer(s)." But the Firm told the trial court that it would be willing to represent Schuck on a pro bono basis, so long as the costs associated with investigating the case would be covered. In particular, the Firm anticipated that the State would rely upon expert scientific evidence regarding human remains allegedly found on Schuck's property; the Firm thought it would need to hire scientific experts to meaningfully question the State's witnesses.

[4]     On November 13, 2014, the trial court denied the petition for attorney fees and reasonable expenses, but it indicated that it would approve "paying necessary expenses incurred in the representation of [Schuck] . . . as long as expenses are approved in advance and are reasonable . . . ." Appellant's App. p. 448-49. On December 16, 2014, the trial court further explained that it "recognize[d] the Defendant's indigency and his need to employ an investigator and perhaps expert witnesses to assure him an adequate defense and a fair trial." *Id*. at 148. The trial court also recognized that Schuck would be prejudiced if the State were able to track what investigations he was pursuing, and set up a procedure by which Schuck could confidentially make a "request for public funds to employ an expert witness." *Id.* Those requests would then be reviewed by the trial court.

[5]     The judge who set up this process, however, retired shortly thereafter, and recused himself from the case on December 30, 2014. On January 2, 2015, a Special Judge was appointed to preside over the case.

[6]     On February 10, 2015, a little more than a month before trial was scheduled to begin, the Firm made a request for public funding to the new judge. It estimated that the preparation of Schuck's defense would require between $5,000 and $15,000, and asked for public funding to meet these expenses. The Firm said that it did not have the requisite expertise in criminal investigation work to conduct an adequate investigation, that it did not have enough time to interview key witnesses, and that the attorneys did not "want to find themselves

in a situation where they have become fact witnesses in this case."[1]  *Id*. at 451. The Firm requested an ex parte hearing regarding its basis for the request.

[7] On March 11, 2015, just five days before trial was scheduled to begin and without holding a hearing, the trial court denied the Firm's request, finding "that it is not necessary to retain the services of a private investigator in this cause and that the attorneys currently representing the defendant have had adequate time to interview all necessary witnesses prior to trial."  *Id*. at 541.  In the meantime, since the Firm had not yet heard back from the trial court, it had paid an investigator to conduct interviews and to locate several witnesses.

[8] Schuck's trial began on March 16, 2015.  The next day, after a jury was sworn and opening statements were presented, the parties reached a plea agreement. Schuck agreed to plead guilty to aiding voluntary manslaughter as a class B felony.  At the plea hearing, Schuck admitted that he knew that his mother, Wilma Schuck (Wilma), had struck Cassidy with a deadly weapon, but that he then left an unconscious Cassidy alone with Wilma, who subsequently strangled her.  After an April 15, 2015, sentencing hearing, Schuck was sentenced to twenty years of imprisonment for aiding voluntary manslaughter, with an additional ten years for being an habitual offender.

[9] On April 22, 2015, the trial court granted the Firm's request for reimbursement for three depositions, but denied its request for reimbursement for any of the

---

[1] We will explain below what the Firm meant by this last statement.

costs of the investigator. The Firm exchanged a series of emails with the trial court, attempting to explain why the use of an investigator was necessary and why they requested an ex parte hearing as part of their motion for public funds. One email explained, "In our 4-5 meetings with Wilma, she continually came closer and closer to admitting she was the one who killed Rebecca . . . . [S]o, we felt it very important to stop talking to her altogether and use, instead, a private investigator to continue investigating what had actually happened to Ms. Cassidy." *Id.* at 20. Indiana Rule of Professional Conduct 3.7 generally prohibits lawyers from being advocates and witnesses in the same trial; the Firm was concerned that if they were the only people who heard Wilma make these statements, they might be forced to testify at Schuck's trial. Therefore, they hired an investigator to interview Wilma so that there would be a witness to Wilma's statements. This investigator also tracked down a potential defense witness who had seen an altercation between Wilma and Cassidy.

[10] On May 22, 2015, the Firm filed a Motion to Correct Error regarding the denial of public reimbursement for the investigator. The trial court allowed affidavits in support of or opposition to the Firm's position. Five criminal defense attorneys wrote affidavits in support of the Firm; they all argued that the fees were reasonable and necessary, and that attorneys would be discouraged from accepting pro bono clients if the attorneys were made to pay for investigations out of pocket. One affidavit stated that "while one might quibble with the rate and billing practices" used by the Firm, "the charges are not unreasonable and

certainly at least 72% of the amount billed would be considered reasonable by the majority of practicing attorneys." Appellant's App. 390.

[11] The Chief Public Defender of Shelby County provided an affidavit in opposition to the Firm's position. He argued that the Public Defender Office has access to low-cost investigators, and might need to obtain additional appropriations for public funds requests; therefore, he did not believe that any request for public funds should be approved unless it was preapproved by his office.

[12] After considering this evidence, the trial court denied the Motion to Correct Error. The court noted that the Firm's invoices "appear[ed] to bill $125.00 per hour for almost 28 hours of interviews with [Schuck's] Mother." Appellant's App. p. 422. The trial court found that these expenses "were not necessary to provide [Schuck] with adequate representation." *Id.* Schuck now appeals.

## Discussion and Decision

[13] Principles of fundamental fairness entitle an indigent defendant to an adequate opportunity to present his claims fairly within the adversary system. *Scott v. State*, 593 N.E.2d 198, 199 (Ind. 1992). The decision as to whether public funds should be used to reimburse expert or investigatory services provided to indigent defendants rests within the sound discretion of the trial court. *Id.* at 200. A court is not required to fund any and all experts the defense believes might be helpful. *Tidwell v. State*, 644 N.E.2d 557, 560 (Ind. 1994). Instead, "the central inquiries are whether the services are necessary to provide an

adequate defense and whether the defendant specifies precisely how he would benefit from the requested expert services." *Id.*

[14] We have previously enunciated some of the factors that should guide trial courts in this determination:

> (1) whether the services would bear on an issue generally regarded to be within the common experience of the average person, or on one for which an expert opinion would be necessary; (2) whether the requested expert services could nonetheless be performed by counsel; (3) whether the proposed expert could demonstrate that which the defendant desires from the expert; (4) whether the purpose for the expert appears to be only exploratory; (5) whether the expert services will go toward answering a substantial question in the case or simply an ancillary one; (6) the seriousness of the charge; (7) whether the State is relying upon an expert and expending substantial resources on the case; (8) whether a defendant with monetary resources would choose to hire such an expert; (9) the costs of the expert services; (10) the timeliness of the request for the expert and whether it was made in good faith; and (11) whether there is cumulative evidence of the defendant's guilt.

*Kocielko v. State*, 938 N.E.2d 243, 254-55 (Ind. Ct. App. 2010), *reh'g granted on other grounds*, 943 N.E.2d 1282 (Ind. Ct. App. 2011).

[15] Although some of these factors do not translate perfectly to the present case—Schuck was not asking for a scientific expert; rather, his attorneys needed an investigator to prevent them from running afoul of the Rules of Professional Conduct—we find that nearly every factor listed in *Kocielko* counsels in favor of public reimbursement of the Firm's investigation expenses.

1) Although questioning Wilma does fall "within the common experience of the average person," the Firm was following the Rules of Professional Conduct in its attempt to avoid becoming a witness and advocate in the same trial;

2) Therefore, the service could not have been performed by counsel;

3) The investigator only needed to interview Wilma to demonstrate what the Firm wanted to demonstrate;

4) The interview was not merely exploratory—the Firm knew exactly what information it was seeking;

5) Whether someone other than Schuck committed the murder with which he was charged is clearly a substantial question;

6) Murder is an extremely serious charge;

7) The State was relying upon expert forensic testimony in this case;

8) A defendant with monetary resources would have hired the investigator to conduct the interview;

9) The cost of the investigation—roughly $6,000—is not large;

10) The request was timely and made in good faith;

11) The cumulative evidence of Schuck's guilt had not been established before trial.

Our Supreme Court has previously recommended "'[d]efense counsel [to] conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of a conviction.'" *Scott*, 593 N.E.2d at 199-200 (quoting ABA

Standards for Criminal Justice (Third Edition), Standard 4-4.1(a) (approved 1991) 49 Crim. L. Rep. (BNA) No. 2, at 2017 (April 10, 1991)). After becoming aware that Wilma had some involvement in Cassidy's death, the Firm had a duty to its client to investigate what Wilma had done. It reasonably concluded that hiring an investigator to interview Wilma was necessary to avoid violating the Rules of Professional Conduct.

[16] The State argues that by pleading guilty, Schuck rendered any investigation "not necessary," as "there was no need to counter the State's case because Schuck's conviction was based entirely upon his own admissions in pleading guilty." Appellee's Br. p. 17. This argument is unavailing for several reasons.

[17] First, our Supreme Court has made clear that defense services to indigent defendants "'should provide for investigatory, expert, and other services necessary to quality representation. These should include not only those services and facilities needed for an effective defense at trial but also those that are required for effective defense participation in every phase of the process.'" *Scott*, 593 N.E.2d at 200 (quoting ABA Standards for Criminal Justice (Third Edition), Standard 5-1.4 (approved 1990) 49 Crim. L. Rep. (BNA) No. 2, at 2022 (April 10, 1991)). The need to factually investigate the claims made against a defendant does not begin at trial. It begins before trial, and the information revealed during the course of the investigation will often be of vital consequence to the defendant and his attorney when deciding whether to accept a plea deal. That is precisely what happened in the present case.

[18] Moreover, the State's argument has terrible public policy implications. Public defenders or pro bono defenders would face a dilemma: if they believed that their client might plead guilty, they would be discouraged from spending any money on any factual investigation of the case. On the other hand, if they decided to spend some money on an investigation, they would be discouraged from counselling their client to accept any plea deal because it would render public reimbursement unavailable. Ironically, in the name of conserving scarce public money, the State would require pro bono defenders seeking public funds to go through a full trial, which would be vastly more expensive, even where the defendant is willing to plead guilty.

[19] The State also repeats the argument made by the Shelby County Public Defender that the Firm was required to get preapproval from the local public defender's office before requesting public funds. Indiana Public Defender Commission's Standard for Indigent Defense Services in Non-Capital Cases, Standard N, deals with the situation of "a person who has retained private counsel for trial . . . [but] is unable to pay for" the investigations "necessary to prepare and present an adequate defense." *Available at* http://www.in.gov/ judiciary/pdc/files/indigent-defense-non-cap.pdf. It states that "[s]uch services are eligible for reimbursement from the public defense fund if authorized by the court." *Id.* It further provides that such requests "should be made by motion to the court . . . ." *Id.* The State has cited no legal authority behind its contrary position, and so its argument fails.

[20] The trial court also expressed a concern that the fees requested were unreasonably high. This is certainly a determination that is within the trial court's discretion to make. But we do not believe that the process should work like a gameshow, where a request for too much money results in no money being awarded. Rather, if the trial court believes that the funding requested is unreasonably high, the trial court should hold a factfinding hearing to determine the appropriate amount of funding, and then award that amount instead.

[21] That is what should occur in this case. Having found that hiring the investigator was necessary in this case, we believe the trial court should now determine what would be the reasonable cost of such an investigation.

[22] The judgment of the trial court is reversed and remanded with instructions to hold a hearing to determine the amount of public funding that should be awarded.

May, J., and Brown, J., concur.